UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
TERRON BELLE, WILLIAM RIOS,

on Behalf of Themselves and Others Similarly Situated,

                    Plaintiffs,

     -against-

THE CITY OF NEW YORK,
NEW YORK CITY POLICE OFFICERS
"JOHN DOE" 1-50,
in their individual and official capacities,

                    Defendants.
-------------------------------------------------------------x

**CLASS ACTION COMPLAINT**

**19 cv 2673**

**ECF Case**

**JURY TRIAL DEMANDED**

Plaintiffs Terron Belle and William Rios, on behalf of themselves and others similarly situated, by their attorneys, Handley Farah & Anderson PLLC and Cyrus Joubin, Esq., complaining of the Defendants, respectfully allege as follows:

**PRELIMINARY STATEMENT**

1. Plaintiffs bring this class action seeking injunctive relief, compensatory damages and attorneys' fees for the violation of their civil rights as well as the civil rights of others similarly situated. Under a pattern and practice enforced by New York City officials, the New York City Police Department ("NYPD") has engaged in an unconstitutional practice of detaining people for the purpose of conducting warrant searches when no reasonable suspicion exists to detain such people.

1

## JURISDICTION

2. This action is brought pursuant to 42 U.S.C. § 1983 ("Section 1983") and 42 U.S.C. § 1988 and the Fourth Amendment to the United States Constitution. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343 (a)(3) and (a)(4), as this action seeks redress for the violation of Plaintiffs' constitutional and civil rights.

## VENUE

3. Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because a substantial part of the acts complained of occurred in this district.

## JURY DEMAND

4. Plaintiffs respectfully demand a trial by jury on each and every one of their claims as pled herein, pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

5. Plaintiff Terron Belle is a United States citizen, an African-American male, and a resident of Manhattan.

6. Plaintiff Williams Rios is a United States citizen, a Latino male, and a resident of Manhattan.

7. The individually named defendants Police Officers "John Doe" 1-50 ("Defendant Officers") are and were at all times relevant herein officers, employees and agents of the NYPD.

8. Each individual defendant is sued in his or her individual and official capacity. At all times mentioned herein, each individual defendant acted under the color of state

law, in the capacity of an officer, employee and agent of defendant City of New York ("Defendant City").

9. At all times hereinafter mentioned, the actions of the Defendant Officers, their agents, and employees were carried out under the color of state law in the course and scope of their duties.

10. The actions of the Defendant Officers deprived Plaintiffs of the rights guaranteed by the Fourth Amendment to the United States Constitution and of their constitutional rights secured by 42 U.S.C. § 1983.

11. The Defendant Officers acted willfully, knowingly and with the specific intent to deprive Plaintiffs of their constitutional rights secured by 42 U.S.C. § 1983 and by the Fourth Amendment to the United States Constitution.

12. Defendant City is a municipality created and authorized under the laws of New York State.  It is authorized by law to maintain, direct and supervise the NYPD, which acts as its law enforcement agent and for which it is ultimately responsible.

## STATEMENT OF FACTS

**The Constitutional Violations against Terron Belle**

13. One evening in the summer of 2017, Terron Belle—an African-American male—was walking home from the subway station at 145th Street and St. Nicholas Avenue in Upper Manhattan.

14. As Mr. Belle walked north along Bradhurst Avenue, he was not engaged in any wrongdoing or suspicious activity.  Rather, he was simply alone, walking home.

15. Around 150th Street and Bradhurst Avenue, an unmarked police car pulled up near Mr. Belle and stopped. Four male NYPD officers in plain clothes—PO Does 1 through 4—emerged from the car.

16. The four officers approached Mr. Belle and surrounded him on the sidewalk. The officers ordered Mr. Belle to turn around and face a gate in order to search him. Mr. Belle complied and turned around.

17. One of the officers thoroughly searched Mr. Belle, frisking him up and down his body and emptying his pockets. There was nothing unlawful, dangerous or suspicious in Mr. Belle's possession. Nor did Mr. Belle say or do anything suspicious or incriminating.

18. After completing the thorough search of Mr. Belle, the officers demanded his identification even though there was no reasonable suspicion to further detain him. Mr. Belle complied and handed over his New York State identification, which included his home address, 267 West 152 Street, located just a few blocks away.

19. One of the officers, PO Doe 1, took Mr. Belle's identification and stepped away from the other officers in order to conduct a warrant search. PO Doe 1 spoke into a radio and audibly spelled out Mr. Belle's full name, using words to signify letters: "Terry (T)...Echo (E)…." PO Doe 1 spelled out Mr. Belle's name so that another officer receiving the transmission could electronically search for outstanding warrants for Mr. Belle.

20. During this warrant search, the officers purported to explain their behavior by informing Mr. Belle that they were "looking for guns."

21. No warrants existed for Mr. Belle.

22. The warrant search took approximately five minutes.

23. After conducting the warrant search over the radio, PO Doe 1 walked back to Mr. Belle and returned his identification. PO Does 1 through 4 subsequently walked away without an apology.

**The Constitutional Violations against William Rios**

24. One morning in the summer of 2017, William Rios took food to his ailing mother at Metropolitan Hospital in Upper Manhattan. After leaving the hospital around noon, Mr. Rios walked toward the subway station at 103rd Street and Lexington Avenue. His plan was to take the 6 train uptown to 116th Street and to walk home from there.

25. Mr. Rios walked north along Second Avenue and took a left at 103rd Street. At that point, 103rd Street becomes a pedestrian walkway that cuts through the George Washington housing project. Mr. Rios walked west along the pedestrian walkway toward Third Avenue.

26. Along the pedestrian walkway, about halfway between Second and Third Avenues, Mr. Rios saw two male police officers wearing baseball hats emerge from an unmarked car in front of him. One of the officers—PO Doe 5—wore his cap forward, while the other officer— PO Doe 6—wore his cap sideways.

27. "Stop! Don't you fucking move," PO Doe 6 shouted at Mr. Rios.

28. PO Doe 5 and PO Doe 6 approached Mr. Rios, with their hands on their holstered guns.

29. Mr. Rios was not engaged in any wrongdoing or suspicious activity. Rather, he was simply walking. Mr. Rios wore basketball shorts and a Michael Jordan tank-top jersey. Mr. Rios had no idea why the officers approached him in this manner.

30. The officers ordered Mr. Rios to stand against a black metal fence bordering the pedestrian walkway. Mr. Rios immediately complied with their order. He faced the fence and put his hands on the metal bars.

31. PO Doe 5 and PO Doe 6 stood on either side of Mr. Rios, with their hands still holding their holstered guns. One of the officers reached into the pockets of Mr. Rios' shorts and removed the contents, which consisted of a wallet, pack of cigarettes, lighter, house keys, handball gloves and cell phone.

32. One of the officers also thoroughly frisked Mr. Rios' entire body. Nothing unlawful or suspicious was found. Mr. Rios possessed no drugs, weapons or contraband of any kind.

33. "What's your name?" asked one of the officers. "William Rios," responded Mr. Rios.

34. "Where are you coming from?" asked one of the officers. Mr. Rios explained that he was returning home from the hospital.

35. Mr. Rios was so frightened by the officers' behavior, including their aggressive tone and continuous placement of their hands on their guns, that his stomach churned and he began to audibly flatulate.

36. Upon hearing this, PO Doe 6 asked, "Is your asshole asking for cock?"

37. PO Doe 6 subsequently took Mr. Rios' wallet, which contained Mr. Rios' Medicaid and Social Security cards, back to the unmarked police car. PO Doe 6 went inside the car to run a warrant search of Mr. Rios' name.

38. During the warrant search, PO Doe 5 stood with Mr. Rios.

39. PO Doe 6 found that there were no warrants for Mr. Rios.

40. The warrant search took approximately five minutes.

41. After conducting the warrant search in the car, PO Doe 6 emerged from the car and walked toward Mr. Rios.

42. PO Doe 6 returned Mr. Rios' wallet and said, "Have a nice day. We were just looking for weapons." The officers then walked back to their car and drove away.

**Evidence and Rulings in the *Ramirez* Lawsuit**

43. In a civil rights lawsuit filed in the Southern District of New York, *Ramirez v. City of New York, et al.*, 16 cv 4174 (ER) (the "*Ramirez* Lawsuit"), plaintiff Richard Ramirez alleged, *inter alia*, that three officers employed by NYPD unlawfully detained him.

44. Mr. Ramirez was a passenger in a livery cab when three plain-clothed NYPD officers from the Anti-Crime Division approached him, interrogated him, ordered him out of the car, and frisked him. Although nothing unlawful or dangerous was discovered in the course of the interrogation and frisk, and although there was no reasonable suspicion to further detain Mr. Ramirez after the frisk, the NYPD officers asked for Mr. Ramirez's license in order to run a warrant search.

45. The NYPD officers detained Mr. Ramirez while the warrant search was being conducted.

46. The warrant search took approximately five minutes.

47. Police officer Dwight Powell is one of the three NYPD officers who detained, interrogated, frisked and conducted a warrant search of Mr. Ramirez. In connection with the *Ramirez* Lawsuit, Officer Powell was deposed on June 23, 2017. During the deposition, Officer Powell was asked why he and two other NYPD officers conducted a

warrant search for Mr. Ramirez. Officer Powell responded that it was "just procedure" to do so.

48. Officer Powell further testified during his deposition that warrant searches take approximately five minutes to complete.

49. On December 18, 2017, Mr. Ramirez moved for partial summary judgment in the *Ramirez* Lawsuit on the basis that his approximately five-minute detention while NYPD officers conducted a warrant search constituted a constitutional violation. *See Ramirez v. City of New York, et al.*, 16 cv 4174 (ER), Dkt. Nos. 43-45.

50. On August 31, 2018, the court granted Mr. Ramirez's motion for partial summary judgment with respect to the unconstitutionality of the five-minute warrant search. *See Ramirez v. City of New York*, 16 cv 4174 (ER), 2018 U.S. Dist. LEXIS 149293 at *11-13 (S.D.N.Y Aug. 31, 2018). The court held that it "cannot see how running a warrant check on a passenger after it is clear that he does not possess weapons or contraband could be considered anything but an 'endeavor to detect crime in general.'" *Id.* at *13. (quoting *Rodriguez v. United States*, 135 S. Ct. 1609, 1616 (2015)).

51. The court also granted Mr. Ramirez's motion to amend his complaint to add a claim of *Monell* liability based on the alleged policy or procedure of the NYPD to unconstitutionally prolong traffic stops by running warrant searches on the occupants of vehicles when no reasonable suspicion for prolonging those occupants' detention existed. *Id.* at 15.

**Arrest Quotas Fuel Unconstitutional Warrant Searches**

52. Substantial evidence exists that NYPD officers are motivated to conduct unconstitutional warrant searches because of the pressure they face to meet illegal arrest quotas.

53. *Crime + Punishment*, an award-winning documentary that was broadcast in August 2018, details the existence and implementation of the arrest quota system. In the documentary, police officer Sandy Gonzalez explains that NYPD officials are "retaliating against me because of my numbers. I would have to massively write summonses and arrest people to come up with the number close to the number that they want to come up with." The interview with Officer Sandy Gonzalez was conducted in 2014.

54. During the last four years, multiple police officers have filed lawsuits against the NYPD alleging that they were unlawfully retaliated against for blowing the whistle on, and complaining about, the existence and implementation of an unlawful arrest quota system.

55. In February 2018, in response to these lawsuits, the NYPD directed police officers to undergo a training that emphasizes that quotas for enforcement activity is against department policy.

56. Nonetheless, the NYPD continues to operate an arrest quota system. In August 2018, Sergeant Edwin Raymond told the *Gothamist* publication, "The quota system is absolutely happening. That's not an opinion, it's a fact. It's every single week."

57. In August 2018, police officer Pedro Serrano told NBC News that NYPD officials "will retaliate if you don't get the numbers."

58. In September 2018, *The New York Post* reported that members of the NYPD's elite Strategic Response Group, which consists of 700 highly trained police officers, were

under pressure from their bosses to meet "secret" arrest quotas. Whistleblowers interviewed by *The New York Post* explained that police officers in the Strategic Response Group who fail to meet the quotas are "given undesirable shifts and denied overtime."

59. According to a December 2018 article published in *The Appeal*, the arrest quota system "continues in other, more subtle forms" and operates through "new, less explicit methods supervisors use to enforce an unofficial quota system today."

60. As a result of the arrest quota system that has existed and continues to exist, NYPD police officers were incentivized to detain or further detain individuals for purposes of conducting warrant searches even when there was no reasonable suspicion meriting such detention.

**The NYPD's Pattern and Practice of Conducting Unlawful Warrant Searches**

61. The NYPD has engaged in a clear pattern and practice of conducting unlawful warrant searches by detaining persons for the purpose of conducting warrant searches when no reasonable suspicion for such detention exists.

62. The NYPD adopted a policy of conducting warrant searches of detained persons even when no reasonable suspicion for such detention exists. NYPD officials possessing authority to establish police procedures instructed police officers employed by NYPD to conduct warrant searches of detained persons even when no reasonable suspicion for such detention exists.

63. The practice of NYPD police officers detaining persons for the purpose of conducting warrant searches when no reasonable suspicion for such detention exists, is so

persistent and widespread that it constitutes a custom that was known to policy-making officials at NYPD.

64. NYPD officials failed to properly train or supervise police officers regarding the unconstitutionality and impropriety of detaining persons for the purpose of conducting warrant searches when no reasonable suspicion for such detention exists.  NYPD officials knew to a moral certainty that police officers would confront situations where they (1) were tempted to detain an individual even when no reasonable suspicion for that detention existed and (2) had detained an individual to conduct a stop-and-frisk or other search based on a reasonable suspicion, but that suspicion was entirely extinguished when the stop-and-frisk or other search produced no drugs, weapons or contraband of any kind.  The NYPD should have properly trained police officers to refrain from detaining individuals for purposes of conducting warrant searches when no reasonable suspicion exists, and to refrain from further detaining individuals for purposes of conducting warrant searches when reasonable suspicion has been extinguished.  Had the NYPD conducted such proper training, police officers would have been far less likely to detain individuals for the purpose of conducting warrant searches when no reasonable suspicion for such detention exists.  The need for such training was evident considering the widespread practice and history of police officers improperly detaining individuals for the purpose of conducting warrant searches when no reasonable suspicion for such detention exists.  This failure to train or supervise amounts to deliberate indifference to the rights of Plaintiffs and the other members of the classes alleged herein, who were predictably and unlawfully detained for purposes of conducting a warrant search when they came into contact with police offers employed by the NYPD.

65. The NYPD persistently failed to discipline police offers who detained persons for the purpose of conducting warrant searches when no reasonable suspicion for such detention existed.  The NYPD was faced with a clear pattern of police officers conducting such unlawful detentions for the purpose of conducting warrant searches, and yet the NYPD did not investigate or discipline those officers, thereby acquiescing in and tacitly authorizing the police officers' unlawful actions.

## DAMAGES

66. As a direct and proximate cause of the said acts of the Defendants, Plaintiffs and other members of the classes alleged herein suffered the following injuries and damages:

   a. Violation of their constitutional rights under the Fourth Amendment to the United States Constitution;

   b. Loss of liberty;

   c. Emotional distress, degradation, and suffering.

## CLASS ACTION ALLEGATIONS

67. Plaintiffs bring this action as a class action under Fed. R. Civ. P. 23(b)(2) for violations of their constitutional rights.  The Rule (b)(2) class is comprised of all persons who were or will be detained for the purpose of running a warrant search in the absence of reasonable suspicion to detain such persons ("Rule (b)(2) Class").  The Rule (b)(2) Class is comprised of all persons detained pursuant to this policy or practice during the fullest period permitted by the applicable statute of limitations.

68. Defendants have acted, or failed to act, on grounds generally applicable to the Rule (b)(2) Class, thereby making appropriate final injunctive relief with respect to the Rule (b)(2) Class as a whole.

69. Upon information and belief, the Rule (b)(2) Class includes thousands of individuals and is so numerous that joinder of all Rule (b)(2) Class members is impracticable.

70. Plaintiffs also bring this action as a class action under Fed. R. Civ. P. 23(b)(3) for violations of their constitutional rights.

71. The Rule (b)(3) Class is comprised of all persons who were or will be detained for the purpose of running a warrant search in the absence of reasonable suspicion to detain such persons ("Rule (b)(3) Class"). The class is comprised of all persons detained pursuant to this policy or practice during the fullest period permitted by the applicable statute of limitations.

72. All members of the Rule (b)(3) Class were injured as a result of Defendants' misconduct.

73. Upon information and belief, the Rule (b)(3) Class includes thousands of individuals and is so numerous that joinder of all Rule (b)(3) Class members is impracticable.

74. The questions of law and fact presented by Plaintiffs are common to members of the Rule (b)(2) Class and the Rule (b)(3) Class (collectively "the Classes"). Among others, the questions of law and fact common to the Classes are:

    a.    whether the NYPD had a policy, pattern and/or practice, explicit and/or tacit, of detaining persons for the purpose of conducting warrant searches in the absence of reasonable suspicion for such detention;

    b.    whether the practice of police officers detaining persons for the purpose of conducting warrant searches when no reasonable suspicion for such

        detention exists, is so persistent and widespread that it constitutes a custom that was known to policy-making officials at NYPD;

    c. whether the NYPD has shown deliberate indifference to the training and/or supervision of officers regarding the circumstances under which individuals can or cannot be detained, or further detained, for the purpose of conducting warrant searches;

    d. whether the NYPD persistently failed to discipline police offers who detained persons for the purpose of conducting warrant searches when no reasonable suspicion for such detention existed;

    e. whether the policy, pattern and/or practice of detaining persons for the purpose of conducting warrant searches in the absence of reasonable suspicion resulted in unconstitutional detentions of persons in violation of their constitutional rights; and

    f. the appropriate injunctive and compensatory remedies that will be needed to ensure (a) that this unconstitutional policy, pattern and/or practice is terminated, and (b) that its harmful effects are remedied.

75. Common issues of law and fact such as those set forth above predominate over any individual issues.

76. This unconstitutional policy, pattern and practice has resulted in the wrongful detention, deprivation of liberty, psychological injury, physical injury and emotional injury of individuals who have committed no crime or violation of law. The claims and practices alleged in this complaint are common to all members of the Classes.

77. The violations suffered by Plaintiffs are typical of those suffered by the Classes. The members of the Classes will benefit from the remedial and monetary relief sought.

78. Plaintiffs have no conflict of interest with any members of the Classes and will fairly and adequately protect the interests of the Classes. Counsel that is competent and experienced in federal class action and federal civil right litigation has been retained to represent the Classes.

79. This action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all members of the Classes is not only impracticable, but impossible given the volume and continuing nature of the violations as well as the transient nature of the members of the Classes. The damages suffered by members of the Classes, although substantial, are small in relation to the extraordinary expense and burden of individual litigation and therefore it is highly impractical for members of the Classes to attempt redress for damages incurred due to their wrongful detention.

80. There will be no extraordinary difficulty in the management of the class action.

## CLAIMS FOR RELIEF

### FIRST CLAIM

**Illegal Seizure**

81. Plaintiffs reallege and reiterate all allegations set forth in the preceding paragraphs as if stated fully herein.

82. By the actions described, the Defendants deprived Plaintiffs and the other members of the Classes of their Fourth Amendment right to be free of unreasonable or unwarranted restraints on personal liberty, specifically their right to be free from unlawful seizures.

83. The Defendant Officers detained or further detained Plaintiffs and the other members of the Classes without reasonable suspicion in order to conduct warrant searches.

84. As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiffs and the other members of the Classes sustained the damages and injuries herein alleged.

## SECOND CLAIM

### Municipal Liability Under Section 1983

85. Plaintiffs reallege and reiterate all allegations set forth in the preceding paragraphs as if stated fully herein.

86. By the actions described, the Defendant City deprived Plaintiffs and the other members of the Classes of their constitutional rights through the NYPD's policy, pattern and practice of detaining persons for the purpose of conducting warrant searches in the absence of reasonable suspicion to detain such persons.

87. As a direct and proximate result of the acts of Defendant City, Plaintiffs and the other members of the Classes sustained the damages and injuries herein alleged.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand the following relief jointly and severally against the Defendants:

a. An order determining that this action may be maintained as a class action under Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and directing that notice of this action be given to members of the Classes;

b. A judgment declaring that Defendants have committed the violations of the law alleged in this action;

c. An order preliminarily and permanently enjoining and directing Defendants to cease detaining persons for the purpose of conducting warrant searches in the absence of reasonable suspicion to detain such persons;

d. An order directing that immediate remedial training on the legal grounds for detaining persons for the purpose of conducting warrant searches be provided to all current members of the NYPD;

e. An order directing Defendants to implement a system for monitoring the warrant searches conducted and the legal bases for such searches;

f. An order awarding compensatory damages for Plaintiffs and the other members of the Classes in an amount to be determined at trial;

g. An order awarding punitive damages in an amount to be determined at trial;

h. An order, pursuant to 42 U.S.C. § 1988, that Plaintiffs and the other members of the Classes are entitled to reasonable attorneys' fees, costs and disbursements; and

i. Such other and further relief as this Court may deem appropriate.

DATED:   March 25, 2019              _____/s/_____
         New York, New York          CYRUS JOUBIN, ESQ.
                                     43 West 43rd Street, Suite 119
                                     New York, NY 10036
                                     (703) 851-2467

joubinlaw@gmail.com

_____/s/_____
HANDLEY FARAH & ANDERSON PLLC
MATTHEW HANDLEY
777 6th Street NW
Eleventh Floor
Washington, DC 20001
202-559-2411
mhandley@hfajustice.com

_____/s/_____
HANDLEY FARAH & ANDERSON PLLC
GEORGE FARAH
81 Prospect Street
Brooklyn, NY 11201
212-477-8090
gfarah@hfajustice.com

*Attorneys for Plaintiffs and the Putative Classes*