# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

TERRON BELLE, WILLIAM RIOS,
RICHMOND APPIAH, EDISON QUITO,
BONACIO CRESPI, JAMEEL LANG, and LUIS
RIOS,

on Behalf of Themselves and a Class of Others Similarly
Situated,                                                    **19 cv 2673  (VEC)**

                                       Plaintiffs,

                -against-                                    **FIRST AMENDED CLASS**
                                              **COMPLAINT**

THE CITY OF NEW YORK,
NEW YORK CITY POLICE OFFICERS
"JOHN DOE" 1-50,                                             **JURY TRIAL DEMANDED**
in their individual and official capacities,

                             Defendants.

------------------------------------------------------------x

## I.      PRELIMINARY STATEMENT

1.   This action, brought by seven New Yorkers on behalf of a class of similarly situated

people, challenges the New York City Police Department's ("NYPD") unconstitutional

practice of detaining people for the purpose of conducting searches of NYPD internal and

external databases (hereinafter "NYPD records search") for records related to the person

detained, including but not limited to warrants, investigation cards (hereinafter "I-cards"),

orders of protection, arrest records, suspected gang affiliations, and suspected matches to

open cases through predictive policing tools without individualized reasonable suspicion.

2.   By exploiting surveillance technology, the NYPD has replaced traditional—and

largely discredited—police practices such as stop and frisk with invasive digital searches

that rely on surveillance systems to provide a detailed snapshot of people's lives, from daily movements to financial footprints.

3. In order to conduct these unconstitutional searches, the NYPD utilizes systems, including the Domain Awareness System ("DAS") the Z FINEST system, and the Criminal Group Database, that aggregate warrant and summons information and a wide range of other data. These advanced technologies disparately impact communities of color.

4. The harassing and unwarranted searches and related seizures stand in stark contrast to their stated purpose—for identifying weapons and preventing violent crime. Instead, on information and belief, the practice disproportionately targets communities of color without any meaningful correlation to crime levels.

5. The NYPD's policy and practice of detaining people without individualized lawful justification in order to search NYPD databases violates the United States Constitution and is the latest tactic in a long history of unwarranted search and seizure practices. The plaintiffs here, who seek to represent a class of similarly situated individuals, seek a declaration that the NYPD's practices are unlawful, damages for the harms they have suffered and an injunction against those practices moving forward.

## II.    JURISDICTION

6. This action is brought pursuant to 42 U.S.C. § 1983 ("Section 1983") and 42 U.S.C. § 1988 and the Fourth Amendment to the United States Constitution. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343 (a)(3) and (a)(4), 2201, and 2202, as this action seeks redress for the violation of Plaintiffs' constitutional and civil rights.

### III.    VENUE

7.   Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because a substantial part of the acts complained of occurred in this district.

### IV.    JURY DEMAND

8.   Plaintiffs respectfully demand a trial by jury on each and every one of their claims as pled herein, pursuant to Fed. R. Civ. P. 38(b).

### V.    PARTIES

*Plaintiffs*

9.   Plaintiff Terron Belle is an African-American male who at all relevant times, was a resident of Manhattan.

10. Plaintiff William Rios is a Latino male who, at all relevant times, was a resident of Manhattan.

11. Plaintiff Richmond Appiah is an African-American male who, at all relevant times, was a resident of the Bronx.

12. Plaintiff Edison Quito is a Latino male who, at all relevant times, was a resident of the Bronx.

13. Plaintiff Bonacio Crespi is a Latino male who, at all relevant times, was a resident of Manhattan.

14. Plaintiff Jameel Lang is an African-American male who, at all relevant times, was a resident of Manhattan.

15. Plaintiff Luis Rios is a Latino male who, at all relevant times, was a resident of Manhattan.

*Defendants*

16. Defendant City of New York ("Defendant City") is a municipality created, authorized, and existing under the laws of New York State. It authorizes, maintains, directs and supervises the NYPD, which acts as its law enforcement agent and for which it is ultimately responsible.

17. The individually named defendants Police Officers "John Doe" 1-50 ("Defendant Officers") are and were at all relevant times officers, employees and agents of the NYPD who acted under color of state law and within the scope of his or her employment. Each individual defendant is sued in his or her individual and official capacity.

## VI.     STATEMENT OF FACTS

### 1.  NYPD's Pattern and Practice of Unlawful Searches and Seizures

18. The named Plaintiffs and the class they represent are not the first victims of NYPD's clear pattern and practice of conducting unlawful searches and seizures.

19. The City has long known that the NYPD maintains unconstitutional policies and practices surrounding the illegal stop and search of its residents. A clear history of civil rights cases, verdicts and settlements, independent monitors and consent decrees have long put the City on notice of these issues. For example:

   a.  1999: The Office of the Attorney General ("OAG") released a report on NYPD's stop and frisk program, following a comprehensive study of stop and frisk data. The OAG report found broad racial disparities in stop and frisk rates, and a pattern of underreporting such stops by NYPD officers.

   b.  2003: The City reached a settlement in *Daniels, et al., v. The City of New York, et al.*, which challenged the NYPD's unconstitutional stop and frisk

Case 1:19-cv-02676-VEC-BCM Document 53 Filed 01/09/20 Page 5 of 28

practices and the impermissible use of race and/or national origin as the determining factor in executing such stops. The Stipulated Settlement mandated that the NYPD to adopt a written policy against racial profiling, and to report quarterly data on stop and frisk activity.

c. 2013: Following a trial in *Floyd, et al. v. the City of New York, et al.* and its companion cases, the District Court for the Southern District of New York found that the NYPD had violated the Fourth and Fourteenth Amendments by engaging in a pattern and practice of conducting unreasonable searches and systematically conducting stops and frisks in a racially discriminatory manner.

20. Concerns surrounding these practices have also consistently been reported in the media and raised before the City Council.

21. In addition to broad class actions against the NYPD on the basis of its practices, the City has also been repeatedly sued by individual citizens victimized by the NYPD's policies.

22. As technology has developed, agency practice has adapted to allow officers to conduct comprehensive searches of City databases from remote locations, including patrol cars.

23. This development along with corresponding policy changes, led, upon information and belief, to a practice of encouraging officers to detain people for the purpose of conducting warrant searches when no reasonable suspicion for such detention exists.

24. NYPD officials possessing authority to establish police procedures instructed line officers to adhere to this policy and practice even when no reasonable suspicion for such

detention exists.  The practice is so persistent and widespread that it constitutes a custom that was known to policy-making officials at NYPD.

25.  Beyond the custom of the Department, NYPD officials failed to properly train and supervise police officers regarding the unconstitutionality and impropriety of detaining persons for the purpose of conducting warrant searches when no reasonable suspicion for such detention exists.  NYPD officials knew to a moral certainty that police officers would confront situations where they (1) were tempted to detain an individual even when no reasonable suspicion for that detention existed and (2) had detained an individual to conduct a stop-and-frisk or other search based on a  reasonable suspicion, but that suspicion was entirely extinguished when the stop-and-frisk or other search produced no drugs, weapons or contraband of any kind.  This failure to train or supervise amounts to deliberate indifference to the rights of Plaintiffs and the other members of the Plaintiff classes, who were predictably and unlawfully detained for purposes of conducting a warrant search when they came into contact with police offers employed by the NYPD.

26.  The NYPD persistently fails to discipline police offers who follow the custom and practice.  When faced with a clear pattern of police officers conducting such unlawful detentions for the purpose of conducting warrant searches, the NYPD did not investigate or discipline those officers, thereby acquiescing in and tacitly authorizing the police officers' unlawful actions.

27.  At all relevant times, the Department has made at least two databases available to officers conducting searches for warrants during unconstitutional stops: The Domain Awareness System ("DAS") and the Z FINEST system.

28. The NYPD's Domain Awareness System (DAS) is a searchable citywide database available from mobile smartphones, tablet devices and precinct desktops that contains at least two million warrants, 11 million arrest records, and 100 million summonses.

29. The NYPD Z FINEST system contains warrant and summons information that, on information and belief, officers may search by calling either the NYPD's Administrative Impact Office or Central Dispatch to request a search by name and/or license number.

**2. Arrest Quotas Fuel Unconstitutional Warrant Searches**

30. On information and belief, NYPD's custom is motivated in part by pressure officers face to meet arrest quotas.

31. The quota system has been well documented. In a 2014 interview featured in 2018's *Crime + Punishment*, police officer Sandy Gonzalez explained the existence and implementation of the quota system and noted that NYPD officials are "retaliating against me because of my numbers. I would have to massively write summonses and arrest people to come up with the number close to the number that they want to come up with."

32. Other officers have sued the NYPD over the last four years alleging that they were unlawfully retaliated against for blowing the whistle on, and complaining about, the existence and implementation of an unlawful arrest quota system. In a response to these lawsuits, in February 2018 the NYPD mandated officer training that emphasizes that quotas for enforcement activity violates department policy.

33. Nonetheless, in August 2018, Sergeant Edwin Raymond reported to the *Gothamist* that "[t]he quota system is absolutely happening. That's not an opinion, it's a fact. It's every single week."

34. That same month, officer Pedro Serrano told NBC News that NYPD officials "will retaliate if you don't get the numbers."

35. In September 2018, *The New York Post* reported that members of the NYPD's elite Strategic Response Group, which consists of 700 highly trained police officers, were under pressure from their bosses to meet "secret" arrest quotas. Whistleblowers interviewed by *The New York Post* explained that police officers in the Strategic Response Group who fail to meet the quotas are "given undesirable shifts and denied overtime."

36. According to a December 2018 article published in *The Appeal*, the arrest quota system "continues in other, more subtle forms" and operates through "new, less explicit methods supervisors use to enforce an unofficial quota system today."

37. As a result of the arrest quota system that has existed and continues to exist, NYPD police officers were incentivized to detain or further detain individuals for purposes of conducting warrant searches even when there was no reasonable suspicion meriting such detention.

   **3. Defendant Officers Violated Plaintiffs' Constitutional Rights by Illegally Detaining Them for the Purpose of NYPD Records Searches.**

   *a. Terron Belle*

38. One evening in 2017, Terron Belle—an African-American male—was walking home from the subway station at 145th Street and St. Nicholas Avenue in Upper Manhattan.

39. As Mr. Belle walked north along Bradhurst Avenue, he was not engaged in any wrongdoing or suspicious activity. Rather, he was simply alone, walking home.

40. Around 150th Street and Bradhurst Avenue, an unmarked police car pulled up near Mr. Belle and stopped. Four male NYPD officers in plain clothes—PO Does 1 through 4—emerged from the car.

41. The four officers approached Mr. Belle and surrounded him on the sidewalk. The officers ordered Mr. Belle to turn around and face a gate in order to search him. Mr. Belle complied and turned around.

42. One of the officers thoroughly searched Mr. Belle, frisking him up and down his body and emptying his pockets. There was nothing unlawful, dangerous or suspicious in Mr. Belle's possession. Nor did Mr. Belle say or do anything suspicious or incriminating.

43. After completing the thorough search of Mr. Belle, the officers demanded his identification even though there was no reasonable suspicion to further detain him. Mr. Belle complied and handed over his New York State identification, which included his home address, 267 West 152 Street, located just a few blocks away.

44. One of the officers, PO Doe 1, took Mr. Belle's identification and stepped away from the other officers in order to conduct an NYPD record search related to Mr. Belle. PO Doe 1 spoke into a radio and audibly spelled out Mr. Belle's full name, using words to signify letters. PO Doe 1 spelled out Mr. Belle's name so that another officer receiving the transmission could electronically search for records pertaining to Mr. Belle.

45. During this warrant search, the officers purported to explain their behavior by informing Mr. Belle, in sum and substance, that they were looking for guns.

46. No warrants existed for Mr. Belle.

47. The record search took approximately five minutes.

48. After conducting the record search over the radio, PO Doe 1 walked back to Mr. Belle and returned his identification. PO Does 1 through 4 subsequently walked away without an apology.

b. *William Rios*

49. One morning in 2017, William Rios took food to his ailing mother at Metropolitan Hospital in Upper Manhattan. After leaving the hospital around noon, Mr. Rios walked toward the subway station at 103rd Street and Lexington Avenue. His plan was to take the 6 train uptown to 116th Street and to walk home from there.

50. Mr. Rios walked north along Second Avenue and took a left at 103rd Street. At that point, 103rd Street becomes a pedestrian walkway that cuts through the George Washington housing project. Mr. Rios walked west along the pedestrian walkway toward Third Avenue.

51. Along the pedestrian walkway, about halfway between Second and Third Avenues, Mr. Rios saw two male police officers wearing baseball hats emerge from an unmarked car in front of him. One of the officers—PO Doe 5—wore his cap forward, while the other officer— PO Doe 6—wore his cap sideways.

52. PO Doe 6 shouted at Mr. Rios to stop and not to move, peppering his command with profanity.

53. PO Doe 5 and PO Doe 6 approached Mr. Rios, with their hands on their holstered guns.

54. Mr. Rios was not engaged in any wrongdoing or suspicious activity. Rather, he was simply walking. Mr. Rios wore basketball shorts and a Michael Jordan tank-top jersey. Mr. Rios had no idea why the officers approached him in this manner.

55. The officers ordered Mr. Rios to stand against a fence bordering the pedestrian walkway. Mr. Rios immediately complied with their order. He faced the fence and put his hands on the metal bars.

56. PO Doe 5 and PO Doe 6 stood on either side of Mr. Rios, with their hands still holding their holstered guns. One of the officers reached into the pockets of Mr. Rios' shorts and removed the contents, which consisted of mundane items like a wallet, pack of cigarettes, lighter, house keys, handball gloves and cell phone.

57. One of the officers also thoroughly frisked Mr. Rios' entire body. Nothing unlawful or suspicious was found. Mr. Rios possessed no drugs, weapons or contraband of any kind.

58. One of the officers asked Mr. Rios for his name, and Mr. Rios responded truthfully "William Rios."

59. One of the officers asked where Mr. Rios was coming from. Mr. Rios explained that he was returning home from the hospital.

60. Mr. Rios was so frightened by the officers' behavior, including their aggressive tone and continuous placement of their hands on their guns, that his stomach churned and he began to audibly flatulate.

61. Upon hearing this, PO Doe 6 asked, "Is your asshole asking for cock?"

62. PO Doe 6 subsequently took Mr. Rios' wallet, which contained Mr. Rios' Medicaid and Social Security cards, back to the unmarked police car. PO Doe 6 went inside the car to run an NYPD records search of Mr. Rios' name.

63. During the search, PO Doe 5 stood with Mr. Rios.

64. PO Doe 6 found that there were no warrants for Mr. Rios.

65. The search took approximately five minutes.

66. After conducting the search in the car, PO Doe 6 emerged from the car and walked toward Mr. Rios.

67.   PO Doe 6 returned Mr. Rios' wallet and told Mr. Rios, in sum and substance, to have a nice day, and that they had just been looking for weapons. The officers then walked back to their car and drove away.

   c.   _Richmond Appiah_

68. On the afternoon of October 19, 2019, Richmond Appiah walked toward a deli on the corner of 155th Street and Courtlandt Avenue in the Bronx.

69. As Mr. Appiah walked, he was doing nothing illegal or suspicious.

70. Suddenly, an unmarked police car heading north on Courtlandt Avenue stopped and three male officers – PO Does 7-9 – emerged from the vehicle and approached Mr. Appiah.

71. In the middle of Courtlandt Avenue near 155th Street, the officers put Mr. Appiah against their vehicle, ordered him to put his hands on top of it, and thoroughly frisked and searched him.

72. Mr. Appiah possessed nothing unlawful.

73. Confused and scared, Mr. Appiah asked, "What did I do?"

74. The officers told Mr. Appiah to shut up.

75. After searching Mr. Appiah and finding nothing unlawful, the officers demanded Mr. Appiah's identification.

76. The officers said they wanted to check Mr. Appiah for warrants.

77. Mr. Appiah handed his New York state driver's license to one of the officers.

Case 1:19-cv-02673-VEC-BCM Document 55 Filed 01/09/20 Page 19 of 28

78. The officer with Mr. Appiah's ID used his NYPD-issued cell phone to check whether Mr. Appiah had any active warrants.

79. Mr. Appiah questioned the legality of the officers' conduct.

80. In response, the officers sarcastically told Mr. Appiah to file a lawsuit against them.

81. During this interaction, a man who lived in the neighborhood approached Mr. Appiah and the officers.

82. The man took the following photograph of Mr. Appiah with the officers.



83. "Is this a shakedown?" the man asked the officers

84. "Yes," replied one of the officers.

85. After the NYPD records search was complete, the officers handed back Appiah's identification.

86. When the officers saw the man holding his phone in their direction, seemingly recording them, they got back in their car and drove away.

87. The officers never identified themselves or gave Mr. Appiah any identification cards.

88. When the officers left, Mr. Appiah walked into the deli on the corner of 155 and Courtlandt Ave.

89. The man who took the photograph of Mr. Appiah and the officers followed Mr. Appiah inside the deli.

90. Inside the deli, Mr. Appiah was clearly upset and shaken up by his encounter with the officers.

91. The man spoke with Mr. Appiah and offered to text Mr. Appiah the photograph he had taken.

92. The man took Mr. Appiah's phone number and around 4:22 p.m., he texted Mr. Appiah the photograph.

    *d.* *Edison Quito*

93. One evening in the summer of 2017, Edison Quito was standing on the sidewalk outside his apartment building at 351 Saint Nicholas Avenue in upper Manhattan.

94. Mr. Quito was waiting for his wife, who was on her way home.

95. A large group of NYPD officers drove up to the front of Mr. Quito's apartment building, got out of their cars, and entered his apartment building.

96. Meanwhile, Mr. Quito was doing nothing suspicious or unlawful outside his apartment building. Nevertheless, two male, plain-clothes police officers – PO Does 10-11, one white, the other Hispanic – emerged from their unmarked car, which was parked in front of Mr. Quito's apartment building, and approached Mr. Quito.

97. The officers asked Mr. Quito what he was doing there.

98. Mr. Quito responded that he lived in the apartment building and that he was waiting for his wife to come home.

99. The officers demanded Mr. Quito's ID.

100. Mr. Quito asked why they wanted his ID if he was doing nothing wrong.

101. The officers replied that they were just following procedure.

102. Mr. Quito handed the officers his New York State learner's permit, which confirmed that he in fact lived in the apartment building in front of which he was standing.

103. While one of the officers remained with Mr. Quito, the other officer went inside the unmarked police car with Mr. Quito's ID.

104. Inside the car, the officer ran a NYPD records search for Mr. Quito.

105. No warrants existed for Mr. Quito.

106. After approximately ten minutes, the officer got out of the car and handed back Mr. Quito's ID.

107. The officers then both returned to their car and drove away.

e. _Bonacio Crespi, Jameel Lang, and Luis Rios_

108.     Late one evening in the late winter or early spring of 2018, Bonacio Crespi,

Jameel Lang, and Luis Rios planned to go out together, along with two other acquaintances.

109.     Mr. Crespi left his apartment building, located at 55 East 102nd Street, and

walked to a pedestrian walkway adjacent to his building, where Mr. Lang, Mr. Rios, and

two other acquaintances were waiting.

110.     As Mr. Crespi walked to his friends, a group of three male NYPD officers

– PO Does 12-14 – approached them, walking north on the pedestrian walkway from 102nd

Street.

111.     Mr. Crespi, Mr. Lang, Mr. Rios, and the two other men were doing nothing

unlawful or suspicious.

112.     The officers demanded ID from the five men.

113.     The officers explained their need for IDs by saying the neighborhood had

been crazy with crime.

114.     The five men gave the officers their IDs.

115.  One of the officers took their IDs and went into an NYPD vehicle parked on 102nd

Street.

116. The other two officers remained with Mr. Crespi, Mr. Lang, Mr. Rios, and the two

other men.

117. The officer in the vehicle conducted NYPD records searches for all five men, and

found that one of the men – but none of the named Plaintiffs – did in fact have a warrant.

118. After conducting the NYPD records searches, the officer returned to the pedestrian

walkway where the two other officers and the five men were standing.

119. The officers arrested the man with an active warrant.

120. The officers patted down the other four men, and found nothing unlawful.

121. The officers handed back Mr. Crespi, Mr. Lang, Mr. Rios, and the other man their IDs.

122. Soon thereafter, the officers left the area.

**4. The City is on Notice of Widespread Illegal Seizures by NYPD Officers as a Result of its Policies, Practices, and Customs**

123. The NYPD has engaged in a clear pattern and practice of conducting unlawful NYPD records searches by detaining persons for the purpose of conducting NYPD records searches when no reasonable suspicion for such detention exists.

124. The NYPD adopted a policy of conducting records searches of detained persons even when no reasonable suspicion for such detention exists. NYPD officials possessing authority to establish police procedures instructed police officers employed by NYPD to conduct records searches of detained persons even when no reasonable suspicion for such detention exists.

125. The practice of NYPD police officers detaining persons for the purpose of conducting records searches when no reasonable suspicion for such detention exists, is so persistent and widespread that it constitutes a custom that was known to policy-making officials at NYPD.

*a. The Ramirez Lawsuit Demonstrates that Illegal Seizures for Purposes of Conducting NYPD Records Searches is "Just Procedure."*

126. In a civil rights lawsuit filed in the Southern District of New York, *Ramirez v. City of New York, et al.*, 16 cv 4174 (ER) (the "*Ramirez* Lawsuit"), plaintiff Richard Ramirez alleged, *inter alia*, that three officers employed by NYPD unlawfully detained him.

127. Mr. Ramirez was a passenger in a livery cab when three plain-clothed NYPD officers from the Anti-Crime Division approached him, interrogated him, ordered him out of the car, and frisked him.  Although nothing unlawful or dangerous was discovered in the course of the interrogation and frisk, and although there was no reasonable suspicion to further detain Mr. Ramirez after the frisk, the NYPD officers asked for Mr. Ramirez's license in order to run a warrant search.

128. The NYPD officers detained Mr. Ramirez while the warrant search was being conducted.

129.  The warrant search took approximately five minutes.

130.  Police officer Dwight Powell is one of the three NYPD officers who detained, interrogated, frisked and conducted an NYPD records search of Mr. Ramirez.   In connection with the *Ramirez* Lawsuit, Officer Powell was deposed on June 23, 2017.  During the deposition, Officer Powell was asked why he and two other NYPD officers conducted an NYPD records search for Mr. Ramirez.  Officer Powell responded that it was "just procedure" to do so.

131.  Officer Powell further testified during his deposition that warrant searches take approximately five minutes to complete.

132.  On December 18, 2017, Mr. Ramirez moved for partial summary judgment in the *Ramirez* Lawsuit on the basis that his approximately five-minute detention while NYPD officers conducted an NYPD records search constituted a constitutional violation.  *See Ramirez v. City of New York, et al.*, 16 cv 4174 (ER), Dkt. Nos. 43-45.

133.  On August 31, 2018, the court granted Mr. Ramirez's motion for partial summary judgment with respect to the unconstitutionality of the five-minute warrant search.  *See*

*Ramirez v. City of New York*, 16 cv 4174 (ER), 2018 U.S. Dist. LEXIS 149293 at *11-13 (S.D.N.Y Aug. 31, 2018). The court held that it "cannot see how running a warrant check on a passenger after it is clear that he does not possess weapons or contraband could be considered anything but an 'endeavor to detect crime in general.'" *Id.* at *13. (quoting *Rodriguez v. United States*, 135 S. Ct. 1609, 1616 (2015)).

134. The court also granted Mr. Ramirez's motion to amend his complaint to add a claim of *Monell* liability based on the alleged policy or procedure of the NYPD to unconstitutionally prolong traffic stops by running warrant searches on the occupants of vehicles when no reasonable suspicion for prolonging those occupants' detention existed. *Id.* at 15.

> b. *Despite Widespread Use of Illegal Seizures for Purposes of NYPD Records Searches, the City Continues to Fail to Train, Supervise, Investigate, and Discipline Officers for this Misconduct.*

135. NYPD officials failed to properly train or supervise police officers regarding the unconstitutionality and impropriety of detaining persons for the purpose of conducting records searches when no reasonable suspicion for such detention exists.

136. NYPD officials knew to a moral certainty that police officers would confront situations where they (1) were tempted to detain an individual even when no reasonable suspicion for that detention existed and (2) had detained an individual to conduct a stop-and-frisk or other search based on a reasonable suspicion, but that suspicion was entirely extinguished when the stop-and-frisk or other search produced no drugs, weapons or contraband of any kind.

137. The NYPD should have properly trained police officers to refrain from detaining individuals for purposes of conducting records searches when no reasonable suspicion exists, and to refrain from further detaining individuals for purposes of conducting records

searches when reasonable suspicion has been extinguished. Had the NYPD conducted such proper training, police officers would have been far less likely to detain individuals for the purpose of conducting records searches when no reasonable suspicion for such detention exists.

138.     The need for such training was evident considering the widespread practice and history of police officers improperly detaining individuals for the purpose of conducting records searches when no reasonable suspicion for such detention exists.

139.     This failure to train or supervise amounts to deliberate indifference to the rights of Plaintiffs and the other members of the classes alleged herein, who were predictably and unlawfully detained for purposes of conducting an NYPD records search when they came into contact with police offers employed by the NYPD.

### 5. Plaintiffs Suffered a Deprivation of Rights, Loss of Liberty, and Emotional Damages, Continue to Suffer, and Reasonably Fear Future Illegal Seizures by NYPD Officers.

140.     As a direct and proximate cause of the acts of the Defendants, the injuries and damages sustained by the named Plaintiffs and other members of the class from the deprivation of civil rights include: violation of their clearly established rights under the Fourth and Fourteenth Amendments to the United States Constitution; personal injuries; pain and suffering; emotional distress; extreme fear; humiliation, indignities, and embarrassment; degradation; injury to reputation; and loss of liberty.

141.     Since their illegal seizures, Plaintiffs fear that future encounters with NYPD officers will result in additional illegal seizures for the purposes of NYPD records searches. Plaintiffs are apprehensive when encountering NYPD officers, and they are hesitant to reach out to NYPD officers should they need the assistance of law enforcement.

a. *The NYPD's Historical and Ongoing Approach of Broken Windows Policing Make it More Likely that Plaintiffs Will Be Illegally Detained*

142. Plaintiffs' fears of future illegal seizures are reasonable and credible, especially because Plaintiffs were not engaged in criminal conduct when detained by NYPD officers. Accordingly, Plaintiffs understand that NYPD officers' improper seizures are not dependent on the presence of criminal conduct.

143. Policing of non-criminal conduct, particularly in communities of color, is a historical norm for the NYPD. In 1994, the NYPD began targeting what it characterized as "quality-of-life offenses" such as marijuana possession and urinating in public, to drive down felony-level crime. *See* Mark G. Peters, and Philip K. Eure, *An Analysis of Quality-of-Life Summonses, Quality-of-Life Misdemeanor Arrests, and Felony Crime in New York City*, 2010-2015 (Jun. 22, 2016). Many summons are issued without probable cause or any legitimate basis. Between 2004 and 2009, 6.2% of summons filed were dismissed as defective and 17.2% were dismissed prior to arraignment as facially insufficient. The number dismissed before trial was consistently over 50%. *Id.* Since 1994, there has been a 500% increase in summons activity under this "quality-of-life" policing theory that expanded targeting of public offenses.

144. Under Mayor Bill de Blasio, the NYPD has continued its approach to broken windows policing, which the Mayor has described as "address[ing] the little things that come from big things. You respond to quality of life concerns that come from the community."

145. Upon information and belief, in addition to being deployed disproportionately in communities of color, these policing strategies disproportionately impact men of color.

146. The NYPD's continued policy of targeting "quality-of-life" offenses results in continued pressure on officers to document their quality-of-life enforcement through summons activity. These same policies and officer incentives make it highly likely that Plaintiffs will face the effects of over-policing, including illegal seizures for purposes of NYPD records searches, again, until a change is made.

## VII.   CLASS ACTION ALLEGATIONS

147. Plaintiffs bring this action as a class action under Fed. R. Civ. P. 23(b)(2) for violations of their constitutional rights.

148.     The Rule (b)(2) class is comprised of all persons who were or will be detained for the purpose of running an NYPD records search in the absence of reasonable suspicion to detain such persons ("Rule (b)(2) Class"). The Rule (b)(2) Class is comprised of all persons detained pursuant to this policy or practice during the fullest period permitted by the applicable statute of limitations.

149.     Defendants have acted, or failed to act, on grounds generally applicable to the Rule (b)(2) Class, thereby making appropriate final injunctive relief with respect to the Rule (b)(2) Class as a whole.

150.     Upon information and belief, the Rule (b)(2) Class includes thousands of individuals and is so numerous that joinder of all Rule (b)(2) Class members is impracticable.

151.     Plaintiffs also bring this action as a class action under Fed. R. Civ. P. 23(b)(3) for violations of their constitutional rights.

152.     The Rule (b)(3) Class is comprised of all persons who were or will be detained for the purpose of running an NYPD records search in the absence of reasonable

suspicion to detain such persons ("Rule (b)(3) Class"). The class is comprised of all persons detained pursuant to this policy or practice during the fullest period permitted by the applicable statute of limitations.

153. All members of the Rule (b)(3) Class were injured as a result of Defendants' misconduct.

154. Upon information and belief, the Rule (b)(3) Class includes thousands of individuals and is so numerous that joinder of all Rule (b)(3) Class members is impracticable.

155. The questions of law and fact presented by Plaintiffs are common to members of the Rule (b)(2) Class and the Rule (b)(3) Class (collectively "the Classes").

156. Common issues of law and fact predominate over any individual issues.

157. This unconstitutional policy, pattern and practice has resulted in the wrongful detention, deprivation of liberty, psychological injury, physical injury and emotional injury of individuals who have committed no crime or violation of law. The claims and practices alleged in this complaint are common to all members of the Classes.

158. The violations suffered by Plaintiffs are typical of those suffered by the Classes. The members of the Classes will benefit from the remedial and monetary relief sought.

159. Plaintiffs have no known conflict of interest with any members of the Classes and will fairly and adequately protect the interests of the Classes. Counsel that is competent and experienced in federal class action and federal civil right litigation has been retained to represent the Classes.

160.    This action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all members of the Classes is not only impracticable, but impossible given the volume and continuing nature of the violations as well as the transient nature of the members of the Classes.  The damages suffered by members of the Classes, although substantial, are small in relation to the extraordinary expense and burden of individual litigation and therefore it is highly impractical for members of the Classes to attempt redress for damages incurred due to their wrongful detention.

161.    There will be no extraordinary difficulty in the management of the class action.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983 – Illegal Seizure in Violation of the Fourth and Fourteenth Amendments

162.    Plaintiffs reallege and reiterate all allegations set forth in the preceding paragraphs as if stated fully herein, and further alleges as follows:

163.    By the actions described, the Defendants deliberately deprived Plaintiffs and the other members of the Classes of their Fourth Amendment right to be free of unreasonable or unwarranted restraints on personal liberty, specifically their right to be free from unlawful seizures.

164.    The Defendant Officers detained or further detained Plaintiffs and the other members of the Classes without reasonable suspicion or probable cause in order to conduct records searches.

165.     These illegal seizures violated the Plaintiff's clearly established Fourth and Fourteenth Amendment rights to be free of unreasonable searches and seizures.

166.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiffs and the other members of the Classes sustained the damages and injuries herein alleged.

## SECOND CAUSE OF ACTION

### MUNICIPAL LIABILITY UNDER 42 U.S.C. §1983 – *MONELL* CLAIM
### Unconstitutional Custom or Policy and Failure to Supervise and Train

167.     Plaintiffs reallege and reiterate all allegations set forth in the preceding paragraphs as if stated fully herein, and further alleges as follows:

168.     The City of New York, by and through its final policymakers, had actual or constructive knowledge that during the relevant time period and for years before, the NYPD had in force and effect a policy, practice or custom of detaining individuals in the absence of reasonable suspicion or probable cause in order to conduct records searches, thus depriving the Plaintiffs and the other members of the Class of their clearly established constitutional rights to be free of unreasonable searches and seizures under the Fourth and Fourteenth Amendments of the United States Constitution.

169.     The City, by and through its final policymakers, knew or should have known that, as a consequence of this policy, practice or custom, these constitutional violations would result, and their failure to correct it amounted to deliberate indifference to the constitutional rights of the City's resident, including the named Plaintiffs, and was the moving force behind the illegal seizures, as well as the other injuries and damages set forth above.

170.     The City, by and through its final policymakers, systematically failed to adequately train its police officers, detectives and investigators not to stop individuals in the absence of reasonable suspicion or probable cause in order to conduct records searches and warrant checks.

171.     The City, by and through its final policymakers, systematically failed to adequately supervise its police officers, detectives, and investigators in appropriately conducting citizen stops and in proper use of the Domain Awareness System and ZFINEST. NYPD employees knew that in this climate of lax supervision, they were free to deviate from constitutional requirements in these areas.

172.     The City, by and through its final policymakers, systematically failed to adequately discipline their police officers, detectives and investigators for investigative wrongdoing, though it was highly predictable that constitutional violations of the type the named Plaintiffs and members of the Classes suffered would result from such failures.

173.     As set forth above, final policymakers for the City had actual or constructive notice of such failures to train, supervise and discipline its employees, and failed to provide training or supervision despite an obvious need for such training and supervision, where the final policymakers knew that officers would confront these situations and as a consequence of the failure to train and supervise, it was highly  predictable that constitutional violations of the type the named Plaintiffs and members of the Classes suffered would result.

174.     Such failures to train, supervise and discipline, and such unconstitutional municipal customs, practices and/or policies, amounted to deliberate indifference to the constitutional rights of the City's residents and visitors, including the named Plaintiffs and

the members of the Classes, and were the moving force behind the unconstitutional seizures, as well as the injuries and damages set forth above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand the following relief jointly and severally against the Defendants:

a.   An order determining that this action may be maintained as a class action under Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and directing that notice of this action be given to members of the Classes;

b.   A judgment declaring that Defendants have committed the violations of the law alleged in this action;

c.   An order preliminarily and permanently enjoining and directing Defendants to cease detaining persons for the purpose of conducting records searches in the absence of reasonable suspicion to detain such persons;

d.   An order directing that immediate remedial training on the legal grounds for detaining persons for the purpose of conducting records searches be provided to all current members of the NYPD;

e.   An order directing Defendants to implement a system for monitoring the records searches conducted and the legal bases for such searches;

f.   An order awarding compensatory damages for Plaintiffs and the other members of the Classes in an amount to be determined at trial;

g.   An order awarding punitive damages in an amount to be determined at trial;

      h.      An order, pursuant to 42 U.S.C. § 1988, that Plaintiffs and the other members of the Classes are entitled to reasonable attorneys' fees, costs and disbursements; and

      i.      Such other and further relief as this Court may deem appropriate.

DATED:      January 3, 2020  
              New York, New York

_____/s/_____  
CYRUS JOUBIN, ESQ.  
43 West 43rd Street, Suite 119  
New York, NY 10036  
(703) 851-2467  
joubinlaw@gmail.com

_____/s/_____  
HANDLEY FARAH & ANDERSON PLLC  
MATTHEW HANDLEY  
777 6th Street NW  
Eleventh Floor  
Washington, DC 20001  
202-559-2411  
mhandley@hfajustice.com

_____/s/_____  
HANDLEY FARAH & ANDERSON PLLC  
GEORGE FARAH  
REBECCA P. CHANG  
81 Prospect Street  
Brooklyn, NY 11201  
212-477-8090  
gfarah@hfajustice.com  
rchang@hfajustice.com

*Attorneys for Plaintiffs and the Putative Classes*